FILED

2013 Mar-25  AM 09:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| NANCY N. RHODES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 7:10-CV-02164-SLB** |
| | ) | |
| TUSCALOOSA COUNTY BOARD OF EDUCATION, | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendant's Motion for Summary Judgment, (doc. 17),[1] and its Motion to Strike, (doc. 25). Plaintiff Nancy N. Rhodes has sued her employer, defendant Tuscaloosa Board of Education, alleging that defendant discriminated against her on the basis of her association with her disabled son and that it retaliated against her for complaining about discrimination. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion to Strike, (doc. 25), is due to be granted in part and denied in part, and its Motion for Summary Judgment, (doc. 17), is due to be granted.

---

[1]Reference to a document number, ["Doc. ____"], refers to the number assigned to each document as it is filed in the court's record.

# I. **MOTION TO STRIKE**

## A. STANDARD OF REVIEW

"A district court has broad discretion in determining the admissibility of evidence" on a motion for summary judgment. *Hetherington v. Wal-Mart, Inc.*, No. 12-13684, 2013 WL 811744, *1 (11th Cir. Mar. 5, 2013)(citing *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1243 (11th Cir. 2009)). The Supreme Court has held the nonmoving party is not required to "produce evidence in a ***form*** that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)(emphasis added). The Eleventh Circuit has "read this statement as simply allowing ***otherwise admissible*** evidence to be submitted in ***inadmissible form*** at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)(citing *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1017 (11th Cir. 1987))(emphasis in *McMillian*). In determining whether evidence is otherwise admissible, the court applies the same rules and standards as it would at trial. *See Munoz v. International Alliance of Theatrical Stage Emp. and Moving Picture Machine Operators*, 563 F.2d 205, 207 n.1 (5th Cir. 1977)("[For] the most part, admissibility of evidence on a motion for summary judgment is subject to the general rules relating to form and admissibility at trial." )(citations omitted).[2]

---

[2]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322-1325 (11th Cir. 1999)(footnote, internal quotations and citations omitted). However, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial." *Id.* at 1323 (citations and internal quotations omitted).

> [T]he phrases "reduced to admissible evidence at trial" and "reduced to admissible form" [are used] to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose. For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Id.* at 1323-24 (footnotes omitted).

The court does not consider unsworn statements. *Dudley v. City of Monroeville*, 446 Fed. Appx. 204, 207 (11th Cir. 2011)("Unsworn statements do not meet the requirements of Rule 56, so the district court could not – and properly did not – rely on the content of the citizen's [unsworn] statement. (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 27 (11th Cir.2003));[3] *see, e.g., Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970)(unsworn statement did not meet the requirements of former Rule 56(e)); *Arthur v. King*, 500 F.3d

---

[3]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

1335, 1343 (11th Cir. 2007)(district court did not abuse its discretion in refusing to consider an unsworn affidavit on a motion to alter or amend the judgment  (citing *Holloman v. Jacksonville Housing Auth.*, No. 06-10108, 2007 WL 245555, *2 (11th Cir. Jan. 30, 2007) (quoting *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980))); *Oglesby v. Terminal Transport Co., Inc.*, 543 F.2d 1111, 1112 (5th Cir. 1976)(court refused to consider unsworn affidavit in response to a motion for summary judgment).

## B.  DISCUSSION

### 1.  Darlene Webb Letters – Plaintiff's Exhibit 6  (Doc. 22-7)

Defendant contends, "Exhibit 6 consists of two letters written by Darlene Webb.  The letters consist of material that is neither material nor relevant to this matter and of hearsay." (Doc. 25 at 1 [citing doc. 22-7 at 2-3].)  At the time she wrote the letters, Webb was a CNP Worker at Taylorville Primary School.[4]  (Doc. 17-7 at 87.)  In these letters, Webb states that Stanley Hord, CNP Director, told her plaintiff "was a bad influence and a real [troublemaker], and . . . she had gotten herself on everybody's list."  (Doc. 22-7 at 2; *see also id*. at 3 ["Mr. Hord told me [plaintiff] was trouble and a bad influence.  He said as long as I run with trouble I would be considered trouble and I would not be getting any job."].) Specifically, the first letter, written on August 14, 2008, states:

> At around 11:45 my manager . . . came to me and told me Mr. Hord wanted to talk to me in [my manager's] office.  I went to her office and sat down.  Mr. Hord began to talk to me about the hiring of managers over the summer.  He

---

[4]"CNP" stands for "Child Nutrition Program."  (*See* doc. 22-10 at 8.)

4

said the lady at Lakeview was hired because she had 15 years of experience in child nutrition in Jefferson County.  I replied to him "you never said that to me, you just said she lives right here.["]  I then said well I don't live far from there.  The he said she lives <u>right there</u>!

I then said "I thought that other position that came up I had done well at the interviews.["]  Mr. Hord told me because I smoked and did not present myself well was why I was not chosen.  Then he told me that the work at the university was not up to his standard.  I replied by saying they must be up to the [fraternity's] standards because they have asked me for over a year to quit the school and take over the kitchen there.  This is when he became red faced and appeared angry.  Then he said and I quote "If you repeat what I am about to say to you, I will come back here and strangle you with my bare hands."  Then he went on to talk about an employee (Nancy Rhodes).  He said she was a bad influence and a real [troublemaker], and how she had gotten herself on everyone's list.  If I continue to associate with her I would be put in the same position and would never go anywhere.  He said you know what I'm saying when I say if you have one bad child those that run with him  are considered bad too.  I replied I consider myself better than that and try to judge people on their merits.  He replied you better listen to what I am saying.

The subject changed to manager classes and other classes that were offered to some but not everyone – I am referring to the hand picked few employees for processing free and reduced forms – I said I did not feel this was right.  He replied since he found out after school he just picked a few.

After feeling his anger and the fact he was trying to intimidate [me] and he had already physically threatened me, I decided to stop the conversation and go back to work.

After processing the event later that afternoon, it occurred to me that this happened last year and was taking place again this year.  So he knew before school was out.

(Doc. 22-7 at 2.)

5

In her second letter, addressed to the EEOC investigator[5] and dated November 11, 2008, Webb wrote:

> Nancy Rhodes informed me you wanted clarification about the discussion between Mr. Stanley Hord and me regarding the statement where Mr. Hord told me Nancy was trouble and a bad influence.  He said as long as I run with trouble I would be considered trouble and I would not be getting another job.  Mr. Hord asked me to end a ten-year long friendship with Nancy if he was going to allow me to get a job as a manager anywhere in the county school system.

(*Id.* at 3.) These letters are not sworn and the record contains no other sworn testimony from Webb.

In his deposition, Hord testified that he had a conversation with Webb, wherein he discussed her association with plaintiff.  (Doc. 17-7 at 89-95.)  He denied making any statement to Webb about ending her friendship with plaintiff; however, he testified he had probably told Webb that plaintiff was a "bad influence" and a troublemaker  (*Id.* at 89, 91, 94.)  He testified that plaintiff "stirs up stuff," and he had told Webb that "they didn't need to talk about what they served that day or what somebody else did or who went where or whatever," and that "they needed to take care of their in-house business and leave it there."  (*Id.* at 93.)  He testified:

> [W]hat I was trying to say to her – and one of the problems they had in the kitchen is they would take stuff from Taylorville and talk to everybody in the world, including [plaintiff].  And one of the things was to try to get them out of the grapevine, so to speak, that . . . she needed to leave that kind of stuff

---

[5]*See* doc. 22-14 at 6, 7.

alone or else she was going to cause a problem between her and other managers.

. . . [I]f you want to move somewhere, if you are considered a busybody, you are not going anywhere; . . . you are going to be stuck there . . . and that was the basis of the conversation.

> . . .

> . . . I'm not asking anybody to end their friendship, it's just a matter of leave stuff alone.

(*Id.* at 90-91, 94.)

Plaintiff contends, "Webb's letters are relevant because they make it more probable that the Defendant failed to promote her because of her association with, and advocacy of, her disabled son." (Doc. 26 at 2.)  Nothing in the letters suggests that Hord considered plaintiff a troublemaker or a bad influence because of her son's disability and/or because of her advocacy on his behalf or her EEOC charges.  Indeed, Hord denied that his conversation with Webb had anything to do with plaintiff's advocacy for her son or retaliation.  (Doc. 17-7 at 95.)

The court will not consider the unsworn statements contained in Webb's letters.  Therefore, defendant's Motion to Strike plaintiff's Exhibit 6 will be granted.  Nevertheless, to the extent that Hord testified regarding the incident, the court has considered evidence of the meeting between Webb and Hord.

7

### 2.  EEOC Letter – Exhibit 13 (Doc. 22-14)

Defendant has moved to strike a letter, dated January 27, 2009, from Jeanne Walker, an Investigator with the EEOC, to defendant's counsel, (*see* doc. 22-14 at 5-6), on the grounds that the letter contains hearsay statements and conclusory statements not supported by evidence, (doc. 25 at 1-2).  The letter to defendant's counsel is not a determination letter; rather, it indicates that it is a summary of "the evidence gathered and analyzed to this point in the investigation."  (Doc. 22-14 at 5, 6.)  It states:

> Evidence indicates that the transfer policy provides as follows:  "The Board, upon the recommendation of the Superintendent, shall have the authority to transfer classified personnel from one position to another when such transfers are in the best interest of the school system."  The evidence indicates that it was a pretext not to transfer Charging Party to a position closer to home because she filed a charge of discrimination and she complained about the way the Board was handling her complaints.  Evidence indicates that [after] Charging Party filed her first charge on April 6, 2007, Charging Party was accused of sending an inappropriate e-mail on October 13, 2006;[6] however, the evidence indicates that the e-mail did not originate from Charging Party's computer.[7]  Evidence indicates that Respondent was aware that many employees were sending inappropriate information through e-mails.  A meeting was conducted to discuss the matter and employees were informed that such conduct would have to end.  The evidence indicates that Charging Party was retaliated against because she filed a charge of discrimination.  There is no finding made with respect to Charging Party's allegation that she was discriminat[ed] against because she had a child with a disability.

(*Id.* at 5 [footnotes added].)

---

[6]Plaintiff was accused in October 2007 of forwarding an offensive email dated October 6, 2006.

[7]The email was forwarded by plaintiff to other employees.  (Doc. 17-8 at 30.)  The fact that plaintiff did not create the email is irrelevant.

The court assumes that the standards for determining whether an EEOC determination is admissible govern consideration of whether the pre-determination letter is admissible. "[A]n EEOC determination may be admissible evidence in a jury trial so long as it is not unduly prejudicial." *Keaton v. Cobb County*, 545 F. Supp. 2d 1275, 1310 (N.D. Ga. 2008)(citing *Walker v. NationsBank*, 53 F.3d 1548, 1554-55 (11th Cir. 1995)). Also, "the admissibility of EEOC findings is subject to the sound discretion of the district court, and a court can refuse to admit an EEOC report if it contains legal conclusions in addition to its factual content, or if it presents issues of trustworthiness. *Hetherington*, 2013 WL 811744 at *1 (citing *Barfield v. Orange County*, 911 F.2d 644, 650 (11th Cir. 1990)). However, on a Motion for Summary Judgment:

> [A] district court is "not required to defer or make reference to the EEOC determination" in its opinion deciding summary judgment and therefore, is not required to find the determination creates an issue of material fact. *See Kincaid v. Bd. of Trs.*, 188 Fed. Appx. 810, 817 (11th Cir. 2006) (citing *Moore v. Devine*, 767 F.2d 1541, 1549-51 (11th Cir. 1985), *modified on reh'g*, 780 F.2d 1559, 1560 (11th Cir. 1986)). It is the Court's, not the EEOC investigator's, duty to determine whether issues of material fact exist. *Walker*, 53 F.3d at 1554-55; *Williams v. Ala. Indus. Dev't Tr'g*, 146 F. Supp. 2d 1214, 1224 (M.D. Ala. 2001). As a result, an EEOC determination "letter is suitable for framing but does not create an issue of fact." *Williams*, 146 F. Supp. 2d at 1224; *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000)("Nor does the EEOC reasonable cause determination create a genuine issue of material fact.").

*Keaton*, 545 F. Supp. 2d at 1310-11; *see also Muhammad v. Audio Visual Services Group*, 380 Fed. Appx. 864, 874 (11th Cir. 2010).

The court denies the defendant's Motion to Strike the pre-determination letter.  The letter is part of the packet of EEOC documents submitted by plaintiff as Exhibit 13.  (Doc. 22-14.)  The letter has sufficient indicia of authenticity and the parties do not dispute the fact that the EEOC found cause.  (*See id*. at 5-6, 8-9.)  However, the court finds the pre-determination letter does not establish a question of fact regarding plaintiff's retaliation and its statement, "The evidence indicates that Charging Party was retaliated against because she filed a charge of discrimination," (doc. 22-14 at 5), is not supported by recitation of any evidence that the decision-makers were aware that plaintiff had filed EEOC charges, see, *supra*.

### 3.  Handwritten Notes – Exhibit 15 (Doc. 22-16 at 5)

Plaintiff's Exhibit 15 contains a page of handwritten notes.  (*See* doc. 22-16 at 5.) Defendant asks the court to strike these notes because the author of the notes is not evident from the record.  (Doc. 25 at 2.)  Plaintiff does not oppose the Motion to Strike this page of her Exhibit 15.  (*See generally* doc. 26.)  Therefore, defendant's Motion to Strike page 5 of Plaintiff's Exhibit 15 will be granted.  The court has not considered this page of handwritten notes in deciding defendant's Motion for Summary Judgment.

### 4.  Email from Plaintiff to Hord – Exhibit 19 (Doc. 22-20 at 3)

Defendant asks the court to strike the portion of plaintiff's Exhibit 19 containing plaintiff's email of May 27, 2008, addressed to Hord, (doc. 22-20 at 3-4), on the ground that "[t]he email contains self[-]serving statements written by Plaintiff and is riddled with hearsay

that is inadmissible pursuant to Rule 802, Federal Rules of Evidence." (Doc. 25 at 3.) The

email states:

> I have put a lot of thought into our discussion on Wednesday, May 21, 2008
> at 1:50. When you told me what I have done flows over into my job, I just
> cannot understand or believe that you as a person would want me to be a bad
> mother. You say I do a great job but it is the other stuff. Well God gave me
> Derrick because he [k]new that I would fight for his rights and take care of
> [H]is child. . . . I appreciate the fact that you notice I do a good job and I am
> not perfect. I am sure that I do make mistakes[,] but it really bugged me that
> you said that you have only 50% of the vote and even if you pulled for me that
> [Costanzo] would kill it before it reach[ed] the board to vote on. This just tells
> me that he is in . . . power and the people under him don't stand up for what
> they believe. Whether you ever [decide] to stand up and fight for your
> managers who give you their all is up to you. I will continue to do a good job.
> I do remember why I took the job and what I love about it is the children. I
> will not play these games by kissing up to everyone; not what I am here for.
> Maybe William [Tunnell][8] is right and one day when Frank Costanzo is no
> longer superintendent people will begin to do what is right and not what is
> easy for them. Maybe one day they will remember why they have a job and
> who they really serve – THE CHILDREN. Thanks for the compliments on my
> pie. That is the quality I strive for everyday that I am cooking for the children.
> Thanks again for listening to my thought[s] about what you had to say, maybe
> one day I can be rewarded for all my hard work instead of being punished for
> being a mother.

(Doc. 22-20 at 3 [footnote added].)

"[M]ere conclusions and unsupported factual allegations, as well as affidavits based,

in part, upon information and belief, rather than personal knowledge, are insufficient to

withstand a motion for summary judgment." *Ellis v. England*, 432 F.3d 1321, 1327 (11th

Cir. at 2005)(citing *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) and *Bald*

---

[8]William Tunnell is the AEA UniServ Director. (Doc. 17-1 at 177.)

*Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir.1989)).  Therefore, what plaintiff "believes" about herself or about the motivations of Costanzo and Hord is not considered evidence of their motivation.

Plaintiff contends that the email should be considered as Hord's statements are admissible under Fed. R. Evid. 801(d)(2)(D) as an admission by a party opponent.  However, plaintiff does not argue that the email  – her own out-of-court statement – or the statement of William Tunnell are admissible testimony.  *See Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997)("Under the federal rules, hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." (quoting Fed. R. Evid. 805))(internal quotations omitted); *see, e.g.*, *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009).

The court will grant defendant's Motion to Strike and has not considered the email in deciding defendant's Motion for Summary Judgment.  Nevertheless, the court notes that both Hord and plaintiff testified as to their conversation on or about May 21, 2008, and the court has considered this testimony.

## C.  CONCLUSION

For the reasons set forth above, defendant's Motion to Strike, (doc. 25), will be granted in part and the court will not consider Webb's letters, (doc. 22-7 at 2-3), the page of handwritten notes, (doc. 22-16 at 5), and plaintiff's email to Hord, (doc. 22-20 at 3).  The

12

Motion to Strike, (doc. 25), will be denied as the EEOC pre-determination letter, (doc. 22-14 at 5-6).

## II.  <u>MOTION FOR SUMMARY JUDGMENT</u>

### A.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## B. STATEMENT OF FACTS[9]

Plaintiff Nancy N. Rhodes is employed as a CNP Manager by defendant Tuscaloosa County Board of Education. (Doc. 17-1 at 60.) She began working for defendant as a CNP

---

[9]As required when determining a Motion for Summary Judgment, the court has construed the facts in the light most favorable to plaintiff, the non-moving party. All disputed facts are resolved in her favor, and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir,. 1997).

Worker in 1999, and defendant promoted her to CNP Manager at Buhl Elementary School in 2002.  (Doc. 17-1 at 15, 56-57, 60-61.)  Buhl Elementary has the fewest number of students in defendant's system.  Following her promotion, plaintiff applied for transfers to a school closer to her home.  (*See id*. at 64, 67, 155-58.)  Because Buhl was the smallest school in the system, a transfer to another school, with more students, would have resulted in a pay increase.  (*Id*. at 153.)

Plaintiff's son is disabled and is a student in the Tuscaloosa County School System. (Doc. 17-1 at 13-14, 23.)  In the past, plaintiff has advocated on behalf of her son in IEP[10] meetings, and, between 2001 and 2004, she filed a due process claim and state complaints over disagreements pertaining to his education.  (Doc. 17-1 at 29, 34, 37, 41, 51-52, 93-94; doc. 17-8 at 29-30.) Superintendent of the Tuscaloosa County Schools, Frank Costanzo, was aware that plaintiff's son was disabled and that she had filed due process claims and state complaints regarding his education, although he did not participate in those proceedings. (Doc. 17-8 at 19-20, 29-30.)  Hord testified that he did not know anything specific about plaintiff's advocacy for her son.  (*See* doc. 17-7 at 26-29.)  Plaintiff did not file a state

---

[10]"IEP" or "individualized education plan" "is an education plan tailored to a child's unique needs that is designed by the school district in consultation with the child's parents after the child is identified as eligible for special-education services." *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 234 and n.1 (2009)(citing 20 U.S.C. §§ 1412(a)(4), 1414(d)). Under the Individuals with Disabilities Education Act [IDEA] "all children with disabilities have available to them a free appropriate public education [FAPE]."  20 U.S.C. § 1400(d)(1)(A).  "To ensure that each disabled child is receiving a FAPE, school districts must create an IEP for each student." *K.I. ex rel. Jennie I. v. Montgomery Public Schools*, 805 F. Supp. 2d 1283, 1290 (M.D. Ala. 2011)(citing 20 U.S.C. § 1414(d)).

complaint or due-process claim relating to her son's IEP between 2003 and August of 2008; however, she advocated for her son "in-house." (Doc. 17-1 at 93-94, 127-29.) Although he was aware plaintiff had filed state complaints and due-process claim regarding her son, Costanzo had no interactions with plaintiff in terms of her son in his role as Superintendent. (Doc. 17-8 at 20-21, 29-30.)

At the end of the 2003 school year, Costanzo, then the Assistant Superintendent, delivered a letter to plaintiff's home informing her that she had not been renewed for the 2003-2004 school year. (Doc. 17-1 at 87-88.) No one was at home, so Costanzo left the letter taped to plaintiff's door, which plaintiff testified was "tacky." (*Id.*) She told Hord that, "if [she] had been there, [she] would have kicked Dr. Costanzo in the balls," and that "it [was] a good thing that the [gun] safe was locked because [she] would [have] run him off [her] property." (*Id.* at 88-89.) Hord told Costanzo about plaintiff's statements. (Doc. 17-7, def. ex. 1 at 38; doc. 17-8 at 23, 26.) Costanzo met with plaintiff and gave her a verbal reprimand for threatening another employee. (Doc. 17-8 at 23-24.) During the meeting, plaintiff apologized. (*Id.* at 26.)    Plaintiff was not terminated and returned to her position as CNP Manager at Buhl. (*Id.* at 85-86, 91.)

In 2001, 2007, and 2008, plaintiff filed grievances with defendant. (Doc. 17-1 at 39-40, 159-60, 160-61, 170, 230-31; doc. 17-8 at 66-67.)

In May or June of 2001, she filed a grievance "against Lex Smith trying to tie my job into my son's education." (Doc. 17-1 at 40.) According to plaintiff, Hord called her and told

her that Smith, then the Director of Special Education, had visited Hord's office and told Hord "that there was an IEP meeting that afternoon;" Hord told plaintiff to be nice to Smith and "when you go to your meeting this afternoon, do not ask for inclusion" for her son.  (*Id*. at 27.)  Plaintiff filed the grievance "because there was no reason for [Smith] to talk to [Hord] about [her] child."  (*Id*. at 40.)  Soon after she filed the grievance, Hord told plaintiff "that [she] needed to watch what [she] was doing because he didn't want to be made to do something that he didn't want to do."  (*Id*. at 41.)  However, Hord did not say directly that plaintiff's son and his special needs affected plaintiff's job.  (*Id*. at 43-44.)

The 2007 grievance concerned defendant hand-picking CNP employees to perform extra work for extra pay and hiring procedures.  (Doc. 17-1 at 159-62.)  Plaintiff did not testify that this grievance complained about discrimination.  (*See id*.)  Neither party has filed this grievance in the record.

The 2008 grievance, which plaintiff filed along with other employees, concerned the same allegations that defendant failed to follow and enforce its own policies regarding selection and training, and claims that defendant selected employees for training and promotions based on favoritism.  (*Id*. at 231-32.)  Plaintiff did not allege that defendant's favoritism was discriminatory.  Hord testified that he was not aware of plaintiff's grievances except one filed "a year or two" before his deposition, which was taken in October 2011. (Doc. 17-7 at 28-29.)

17

According to defendant's policy, when a CNP Manager position becomes vacant, the vacancy is posted on defendant's website, at its offices and at the school. (Doc. 17-8 at 60; doc. 17-2 at 21.) Anyone interested in the vacant position can submit a letter of interest to defendant or to the school's principal. (Doc. 17-8 at 43, 60.) Also, a current employee may submit a request for transfer to that position. (*Id*. at 60-61.) An employee submitting a request for transfer is not automatically entitled to a transfer, but she is interviewed and considered with all other applicants. (*Id*. at 61; *see* doc. 17-1 at 162-64.)

After all applications are submitted, interviews are scheduled for the position. (Doc. 17-8 at 61-62.) The interviewers score the applicants based on their responses to each question. (Doc. 17-7 at 32; doc. 17-8 at 62-63.) After the interviews are completed, the scores for each applicant are averaged. (Doc. 17-8 at 63; doc. 17-7 cites.)

The principal notifies the Human Resources Department in writing of his or her recommendation. (Doc. 17-8 at 15, 63-64.) The Human Resources Department reviews the recommendation and determines if the applicant meets the minimum qualifications. (*Id*. at 15.) If so, the Human Resources Department forwards the recommendation to the Superintendent for his review. (*Id*.) The Superintendent determines whether to recommend the applicant to the Board. (*Id*.) If he recommends the applicant, the Board votes on the recommendation. (*Id*. at 44.) If the Board approves the recommendation, the applicant is employed. (*Id*.)

18

Costanzo supervises the principals; he also participated in interviews and hiring decisions for vacant principal positions.  (Doc. 17-8 at 14-16.)

In February 2007, the position of CNP Manager at Maxwell Elementary School was available.  (Doc. 17-1 at 129-30.)  Plaintiff testified that she spoke with Principal Brenda Rickett, who told plaintiff that, because plaintiff's son was no longer a student at Maxwell Elementary, Rickett would "definitely consider" plaintiff for the position.  (*Id*. at 130-31.) Plaintiff applied for a transfer, but she was not selected for the position.  (*Id*. at 131.) Costanzo did not discuss plaintiff with Rickett.  (Doc. 17-8 at 65.)

She filed her first EEOC charge following her non-selection.  (Doc. 17-1 at 149.)

This EEOC charge stated:

> I have a child with a disability who is enrolled in the Tuscaloosa County school system.  I was hired by the Tuscaloosa County school system in August 1999, as a child nutrition program worker.  I was promoted to manager in 2002.  During my tenure of employment, I have filed complaints under the Americans with Disabilities Act against the school system on behalf of my child.  The last complaint was filed in 2003.  Since filing the complaints, I have been denied promotions to five positions.  I was denied a promotion to manager of another location on February 12, 2007.  The position was filled by a less-qualified individual.

> No reason was given for me not being selected for the position.

> I believe that I was not promoted because of my association with an individual with a disability and in retaliation for filing complaints under the Americans with Disabilities Act in violation of the Americans with Disabilities Act of 1990.

(Doc. 17-1 at 71.)  Costanzo was aware of the charge.  (Doc. 17-8 at 33.)  Hord testified he was unaware of plaintiff's EEOC charge until 2011, when he was preparing for his deposition.  (Doc. 17-7 at 29.)

In August 2007, the position of CNP Manager at Hillcrest High School became vacant.  (Doc. 17-1 at 181, L. 13-15; doc. 17-9 at 13-14.)  Plaintiff and others applied for the position.  (Doc. 17-1 at 181; doc. 17-7 at 60; doc. 17-9 at 26.)  Principal Jeff Hyche, his assistant principals, and Hord interviewed the applicants, including plaintiff.  (Doc. 17-1 at 181-83; doc. 17-7 at 31; doc. 17-9 at 15; doc. 17-10.)  Hord did not actively participate in the interviews.  (Doc. 17-9 at 15-16.)  Following the interviews, Hyche met with his assistants and Hord, and they tallied their scores.  (Doc. 17-9 at 22; doc. 22-3 at 32; doc. 17-10 at 3.)  Darlene Hupp received the highest average interview score. (Doc. 17-7 at 40.)  Hyche gave her a score of 53 and plaintiff a score of 51.  (*See* doc. 22-19 at 2, 4.) Hord gave plaintiff a score of 29 and Hupp a score of 54.  (*Id*. at 3,5.)  The scores of the assistant principals are not in the record.  (*See generally id*.)  Hyche testified that he ultimately made the final decision to recommend Hupp.  (Doc. 17-9 at 23, 31.)  Hyche recommended Hupp for the CNP Manager position.  (Doc. 17-7 at 40; doc. 17-9 at 31.)  This recommendation was submitted by Costanzo to the Board, and the Board approved Hupp for the Hillcrest High School CNP Manager position.

Prior to being selected for the CNP Manager position, Hupp had served as the interim CNP Manager at Hillcrest High School for several months during the previous school year.

20

(Doc. 17-9 at 31-32; doc. 17-10.)  At that time, plaintiff had been the CNP Manager at Buhl Elementary School for five years.  (Doc. 22-5).  Hillcrest High School has 1,000 students and 14 CNP workers; plaintiff supervised only 2 CNP workers at Buhl Elementary, which has the lowest number of students, 160-200.[11]  (Doc. 17-1 at 153; doc. 17-7 at 42.)  Hyche testified that Hupp had done a good job as interim CNP Manager and she had no problems during her tenure.  (Doc. 17-9 at 34, 36, 37; doc. 17-10.)  He testified Hupp had a good working relationship with the staff in the Hillcrest High School cafeteria; and all the cafeteria workers had asked him to hire Hupp as the permanent CNP Manager.  (Doc. 17-9 at 37-38; doc. 17-10.).

Hyche did not know plaintiff before she applied for the position at his school.  (Doc. 17-9 at 26.)  He did not know plaintiff had a special-needs child until some time after he made his hiring decision.  (Doc. 17-9 at 26-27, 39; doc. 17-10.)  Also, he did not know plaintiff had filed an EEOC complaint until after he made his hiring decision.  (Doc. 17-9 at 33-34; doc. 17-10.)  He testified that neither Costanzo nor Hord attempted to influence his hiring decision in any way and that neither discussed plaintiff with him.  (Doc. 17-9 at 23-24, 30, 39-40, doc. 17-10; *see also* doc. 17-7 at 46-47, 108; doc. 17-8 at 65.)

---

[11]Hord testified that plaintiff had "run off" two long-term employees after her first year at Buhl and that there were seven different employees for the two positions over the seven years she was at Buhl.  (Doc. 17-7 at 35.)  At his deposition in October 2011, he testified that, since 2009, there had been 100% employee turnover in the CNP Workers under plaintiff's supervision, and, since 2002, there had been 350% employee turnover in CNP Workers under plaintiff's supervision.  (*Id*. at 44.)

Hord testified that he did not know plaintiff had filed an EEOC charge.  (Doc. 22-3 at 29, 47-48.)  However, he was aware that plaintiff's son has a disability.

After Hupp was hired as the CNP Manager, plaintiff went to Hillcrest High School to ask Hupp "what she [had] supplied to the County Board to apply for that position."  (Doc. 17-1 at 188.)  Plaintiff testified that she has called other applicants to determine what they had submitted and if "everybody was being treated the same."  (*Id.* at 191-92.)  She was questioned about asking Hupp her age, which plaintiff denied.  (*Id.* at 187.)  Nevertheless, she testified she would have asked that question, "because another manager wanted to know how old other people were," and this other manager thought age was an issue in hiring.  (*Id.* at 187-88.)

The EEOC issued plaintiff a Dismissal and Notice of Rights on September 4, 2007.  (Doc. 17-1 at 72.)  Plaintiff did not file a Complaint within 90 days of receiving her Notice of Rights.  However, the following day, on September 5, 2007, plaintiff filed a second EEOC charge.  (*Id.* at 73.)  This charge stated:

> I have a child with a disability who is enrolled in the Tuscaloosa County school system.  I was hired by the Tuscaloosa County school system in August 1999, as a Child Nutrition Program Worker.   During my tenure of employment, I have filed complaints under the Americans with Disabilities Act against Respondent on behalf of my child.  During the week of August 10, 2007, I submitted an application and other documentation requested by the Respondent in applying for the position of Child Nutrition Manager (CNP Manager) at Hill Crest [sic] High School.  This position would have been a promotion.  On August 17, 2007, I received a letter from Jeff Hyche, Principal at Hill Crest [sic] High School[,] informing me that I was not selected for the position.

> No reason was given why I was not selected for the vacant position.
>
> I believe that I was not promoted because of my association with an individual with a disability under the Americans with Disabilities Act, in violation of the Americans with Disabilities Act of 1990.  I also believe that I have been discriminated against by not being promoted in retaliation for protesting a practice that is unlawful under the Americans with Disabilities Act and for filing EEOC Charge 420-2007-02455 [plaintiff's first EEOC Charge].

(Doc. 17-1 at 73.)  Costanzo was aware of this charge.  (Doc. 17-8 at 38-39.)  Hord testified he was unaware of either of plaintiff's EEOC charges until 2011, when he was preparing for his deposition.  (Doc. 17-7 at 29.)

After plaintiff was not selected for the Hillcrest High School position, she filed a grievance complaining about defendant's hiring procedures.   (Doc. 17-1 at 170-71.) According to plaintiff's deposition testimony, this grievance "had to do with hiring procedures . . . plus a couple of other things."  (*Id*. at 170.)  Also, according to plaintiff, she believed this grievance had been resolved until Costanzo did not follow through on his agreed changes to the hiring procedures.  (*Id*. 177-78, 180.)  The parties have not provided the court with the grievance or the terms of the purported resolution.  Nevertheless, plaintiff does not contend that her grievance raised issues protected by the ADA.

Costanzo met with plaintiff concerning this grievance after the EEOC had issued plaintiff a right-to-sue letter on her first EEOC charge.  (*Id*. at 176.)  After the meeting and during a discussion of costs associated with plaintiff's grievance, Costanzo asked Tunnell, plaintiff's union representative, "[D]o you know how much this one employee has cost the

system."[12] (*Id*. at 17-1 at 270.)  Tunnell also told plaintiff that Costanzo did not like her.  (*Id*. at 142.)

Plaintiff alleges that, on or about May 21, 2008, "Hord had informed her that her advocacy for her disabled child overflows into her employment with the Tuscaloosa County Board of Education," and that "Costanzo would kill [her selection] before it reach[ed] the board to vote on."  (Doc. 22 at 17 [citing doc. 22-20].)  As support for this fact, plaintiff relies on statements she made in an unsworn email, which the court has stricken.  Plaintiff testified that Hord did not tell her that Costanzo had told him he would never recommend plaintiff for another position.  (Doc. 17-1 at 141-42.)  Plaintiff testified that the comment, "things you have done [have] affected you," was made following her interview for the Davis Emerson Middle School in 2003.  (*Id*. at 133-34; doc. 17-7 at 77-78.)  Hord testified he did not remember saying that specifically, but he testified he had "tried to explain to [plaintiff] to not be involved in some things [and to] attend to her business at home and leave everybody else's alone."  (Doc. 17-7 at 78.)  According to Hord's sworn testimony, the discussion had nothing to do with plaintiff's disabled son or her efforts on his behalf.  (*Id*. at 79, 82.)  Moreover, he testified that his comments about Costanzo related to the strained relationship between plaintiff and Costanzo after she threatened to kick him in the balls.

---

[12]Costanzo testified that the comment was made during a discussion about costs and attorney fees related to the grievance.  (Doc. 17-8 at 50-51.)  He testified that grievances "had been a repetitive thing," and "there was a high cost as a result."  (*Id*.)

Hord testified that he did not know plaintiff had filed EEOC charges.  (Doc. 17-7 at 29, 47-48.)

During the spring and summer of 2008 the CNP Manager positions at Duncanville Middle School, Englewood Elementary School, Matthews Elementary School, Hillcrest Middle School, and Faucett-Vestavia Elementary School each became vacant.  (Doc. 17-1 at 218-220, 223; doc. 17-2 at 15; doc. 17-3 at 13; doc. 17-4 at 13; doc. 17-5 at 11-12; doc. 17-6 at 11-12.)  Plaintiff applied for each position.  (Doc. 17-1 at 218.)

On or before May 19, 2008, plaintiff and other applicants interviewed for the CNP Manager position at Hillcrest Middle School.  (Doc. 17-1 at 219; doc. 17-5 at 12; *see* doc. 22-10 at 4.)  The interviews were conducted by Principal C'Kimba Hobbs and Hord.  (Doc. 17-1 at 219; doc. 17-5 at 12, 17-18; doc. 17-7 at 51.)  Hord and Hobbs discussed the interview process; Hobbs testified that he wanted guidance from Hord as to the type of questions to ask.  (Doc. 17-5 at 18.)  After the interviews were completed, Hobbs and Hord discussed the interviews, but Hord did not say anything to Hobbs about plaintiff.  (Doc. 17-5 at 22-23.)  Hobbs testified he was responsible for making the selection decision.  (*Id.* at 24.)  Hord testified that their interview scores were averaged.  (Doc. 22-3 at 56.)  Sylvia White had the highest interview score, followed by plaintiff and Heather Boatner, and Hobbs selected White for the position.  (Doc. 22-10 at 13.)

Hobbs stated that he found nothing particularly notable about plaintiff's interview.  (Doc. 17-5 at 22.)  He was familiar with plaintiff's son because he had been his student.

25

(Doc. 17-5 at 12-13, 38-39.)  However, he testified that he was not aware that plaintiff had any complaints, including EEOC charges, against defendant.  (Doc. 17-5 at 41-42, 48.)  In fact, he was not aware of any friction between plaintiff and anyone else in the school system. (Doc. 17-5 at 39.)

Hobbs testified he considered White to be the most qualified candidate for the position.  (Doc. 17-5 at 49.)  He knew White because she had worked in the lunchroom at his school the entire time he had been there.  (Doc. 17-5 at 24, 28-29, 49.)  In fact, White had worked for approximately 20 years at Hillcrest Middle School; she had never applied for another position at another school.  (Doc. 22-3 at 53-54.)

Hord did not tell Hobbs not to select plaintiff.  (Doc. 17-5 at 45.)  In fact, according to Hobbs, Hord never said anything negative about plaintiff.  (Doc. 17-5 at 42, 45, 49.) Plaintiff contends that Hord gave Hobbs "input."  (Doc. 22 at 6 [citing doc. 17-5 at 18-22].) However, Hobbs's testimony does not support a finding that Hord had any influence over Hobbs's selection of White for the position.

Hobbs never had any discussions with Costanzo about plaintiff.  (Doc. 17-5 at 43.) Costanzo never told Hobbs not to select plaintiff, and he never said anything negative to Hobbs that would influence his decision.  (Doc. 17-5 at 45, 49-50.)

Hobbs recommended White for the CNP Manager position at Hillcrest Middle School and the Board approved White's selection.

On May 21 and 23, 2008, plaintiff and other applicants were interviewed for the position of CNP Manager at Duncanville Middle School.  (Doc. 17-1 at 218-19; doc. 17-2 at 22; doc. 22-10 at 10.)  Principal Dorothy Dockery and Hord interviewed the applicants.  (Doc. 17-1 at 219; doc. 17-2 at 18; doc. 17-7 at 57.)  Each applicant was asked the same questions.  (Doc. 17-2 at 60.)  Dockery and Hord took notes during the interview and discussed their scores afterwards.  (Doc. 17-2 at 31-32.)  Dockery testified Hord had input into the decision but that she had made the final decision as to whom she would recommend.  (Doc. 17-2 at 32.)

On May 27, 2008, Dockery and Hord informed plaintiff that Heather Boatner had been selected for the position; Hord testified Boatner was selected because she had the highest interview score.  (Doc. 17-2, ex. 4 at 25, ex. 12 at 34; doc. 22-3 at 59-60.)  Her score was obtained by combining the interview scores of Dockery and Hord.  (Doc. 17-2 at 39-40; doc. 17-7 at 59.)  Hord testified that he did not remember discussing plaintiff with Dockery and that he did not discuss Boatner, except to note that she had the highest averaged interview score.  (Doc. 17-7 at 58, 59-60.)  Dockery testified Hord never said anything negative about plaintiff and Costanzo never discussed plaintiff with her.  (Doc. 17-2 at 69-70.)

Dockery testified that she "had the discretion to choose the person that [she] felt like best fit Duncanville Middle School," and that she was not required to select the applicant with the highest interview score, although the person selected, Boatner, had the highest

interview score.  (Doc. 17-2 at 39.)  Boatner had served as interim CNP manager at her previous school for several months before applying for the position at Duncanville Middle School.  (Doc. 17-2 at 61-62.)  Dockery testified that she had selected Boatner because:

> during the interview process and getting to know [her], I liked her level of energy, which I thought would bring newness to the whole school.  But also . . . I felt like she was qualified and would have an opportunity to advance. She doesn't live far from school and would be a community member, and would be a vested part of the school in our community.  But also in giving her the opportunity to get a promotion, it wasn't going to cause a domino effect in any school.

(Doc. 17-2 at 71.)  Duncanville Middle School opened in the 2008-2009 school year. (*Id*. at 13.)  Although Dockery noted that plaintiff had "good energy," she did not know where plaintiff lived and selecting plaintiff would cause a domino effect among CNP Directors. (*Id*. at 71, 73-74.)  Hord testified that Boatner was very energetic, she was a hard worker, and she has had little turnover.  (Doc. 22-3 at 58-59.)

At the time of her recommendation, Dockery was unaware that plaintiff had filed any sort of complaints against defendant, including her EEOC complaints.  (Doc. 17-2 at 48-50, 52.)  Dockery was aware that plaintiff's son is disabled and had participated in IEP meetings with plaintiff.  (Doc. 17-2 at 50-51.)  However, she was not aware of any friction between plaintiff and any employee of defendant because of plaintiff's son. (Doc. 17-2 at 51-52.) She denied any friction between herself and plaintiff.  (Doc. 17-2 at 52.)

Dockery recommended Boatner for the CNP Manager position at Duncanville Middle School and her recommendation was approved by defendant.  (Doc. 17-2 at 54, 58 and pl. ex. 11.)

On or about June 27, 2008, plaintiff and others were interviewed for the CNP Manager position at Faucett-Vestavia Elementary School.  (Doc. 17-1 at 220; doc. 17-6 at 13 and pl. ex. 22; doc. 22-10 at 14.)  The interviews were conducted by Principal Genea Monroe and Hord.  (Doc. 17-1 at 220; doc. 17-6 at 14-15; doc. 17-7 at 61; doc. 22-10 at 14.)  After the interviews were completed, Monroe gave the candidates a written question.  (Doc. 17-6 at 16; doc. 17-1 at 220.)  Then, the scores were added.  (Doc. 17-6 at 24-25; doc. 17-7 at 64-65.)  Monroe and Hord did not discuss the applicants.  (Doc. 22-3 at 64.)  Pam Robinson received the highest score.  (Doc. 17-6 at 26 and pl. ex. 22; doc. 22-10 at 14.)

Monroe decided to hire Robinson because she had the highest score.  (Doc. 17-6 at 21.)  She testified that she had decided Robinson was the best candidate because "[s]he came highly recommended" by her principal and her CNP Manager.  (Doc. 17-6 at 37.)  Monroe did not call plaintiff's references.  (*Id.*)  Nothing in the record indicates that plaintiff submitted references with her application.  Hord testified that Robinson had an excellent interview.  (Doc. 22-3 at 64.)  He also testified that she was hard working and outgoing.  (*Id*. at 62.)

Monroe testified that she knew plaintiff prior to the interview because she had been an Assistant Principal at Englewood Elementary at the same time plaintiff worked at that

school.  (Doc. 17-6 at 33.)  Plaintiff's son was a student at that school at this same time and Monroe was aware of his disability.  (*Id*.)  However, Monroe was not aware that plaintiff had filed any complaints against defendant because of her son.  (Doc. 17-6 at 34.)  Also, she was not aware that plaintiff had filed EEOC charges against defendant.  (Doc. 17-6 at 34-35.)

Monroe testified that Hord did not say anything to her about plaintiff's son.  (Doc. 17-6 at 34.)  Also, she testified that Hord did not tell her not to select plaintiff and he did not make any other negative comment about plaintiff.  (Doc. 17-6 at 34, 37-39.)  She testified that Hord had not said anything to influence her decision.  (Doc. 17-6 at 38; *see also* doc. 17-7 at 108.)

Plaintiff alleges that Hord "influenced" Monroe's decision by participating in framing and asking interview questions and scoring of the applicants' interviews.   (Doc. 22 at 6 [citing doc. 17-6 at 14-16, 25-26].)  However, nothing in the record indicates that Hord actually scored plaintiff significantly lower than Robinson such that an average of the scores would give Robinson a higher average score than plaintiff.  And, nothing in the record indicates that Monroe did not score Robinson higher than plaintiff, such that Robinson was her choice.   Monroe has never spoken to Costanzo about the CNP Manager position or about plaintiff.  (Doc. 17-6 at 35.)  He did not instruct Monroe not to hire plaintiff or otherwise say anything negative about plaintiff or about her son.  (Doc. 17-6 at 38.)

Monroe recommended Robinson for the CNP Manager position at Faucett-Vestavia Elementary School and the Board approved Robinson's selection.

Plaintiff and others interviewed for an available CNP Manager position at Matthews Elementary School on or about July 28, 2008.  (Doc. 17-1 at 224; doc. 17-4 at 14; doc. 22-10 at 12; doc. 22-3 at 67.)   These interviews were conducted by Principal David Scott and Hord.  (Doc. 17-1 at 16, 224; doc. 17-7 at 66.)  Following the interviews, Scott and Hord discussed the interviews.  (Doc. 17-4 at 19.)  The applicants received a final score based solely on their interviews.  (*Id*. at 45.)  Scott testified that he had the final decision as to whom he would recommend for the position. (Doc. 17-4 at 45-46.)  However, Hord testified that he and Scott averaged their interview scores to select the applicant.  (Doc. 22-3 at 69.) Scott recommended Chong Suk Hubbard, the applicant with the highest interview score, for the job of CNP Manager at Matthews Elementary School. (Doc. 17-4 at 20-21 and ex. 15.)

At the time of the interviews, Hubbard was working at Matthews Elementary School and, therefore, she was familiar with the school and its lunchroom.  (Doc. 17-4 at 24-26.) She had been training with the previous CNP Manager in preparation for becoming a CNP Manager.  (Doc. 17-4 at 33-34.)  Indeed, Scott testified he had selected Hubbard based on her familiarity with the school, the faculty, the students and the lunchroom.  (Doc. 17-4 at 50-51.)   As to his discussion with Hord regarding the interviews, Scott testified:

> . . . Once we completed the interviews, we talked about the overall interview questions and the candidates, and he and I talked about what I was looking for in terms of a CNP manager at the school.  And in particular, we just talked about what kind of fit I needed in terms of the student body, the faculty, and staff, being familiar with the school, familiar with the students and the responsibilities of a CNP manager.
>
> . . .

31

> Well, as the principal, I wanted the best person for the job, obviously, but also someone who was familiar with not just the CNP part of it, the manager position, but also the faculty and staff and also the student body, if at all possible.
>
> Sometimes you can't get that in every situation, but those were our main concerns; finding someone who was familiar with the school and the student body and needs of the school.

(*Id.* at 19-20.)  Hord testified that Hubbard had a good interview.  (Doc. 22-3 at 69.)

Scott had not met plaintiff before her interview.  (Doc. 17-4 at 46-47.)  He did not know that she had a son with special needs.  (Doc. 17-4 at 47.)  Moreover, he was not aware that she had filed any sort of complaint, including EEOC charges, against defendant.  (Doc. 17-4 at 47, 49.)  He also testified that Hord did not say anything to dissuade him from selecting plaintiff.  (*Id.* at 50.)  In fact, Scott testified that he did not remember Hord saying anything about plaintiff.  (*Id.* at 25.)  Also, Scott never spoke to Costanzo about the CNP Manager position at Maxwell Elementary or about plaintiff.  (*Id.* at 48.)

Plaintiff contends that Hord influenced Scott's recommendation based on his participation in and scoring of the interviews.  (Doc. 22 at 5-6 [citing doc. 17-4 at 16-19].)  However, Scott's testimony refutes any inference that Hord influenced Scott's selection of Hubbard.  (*See* does 17-4 at 16-19.)

Scott recommended Hubbard for the CNP Manager at Maxwell Elementary and the Board approved Hubbard for the position.

Plaintiff and others were interviewed for a CNP Manager position at Englewood Elementary School on or about July 30, 2008.  (Doc. 17-1 at 223; doc. 17-3 at 14-15, 18; doc.

22-10 at 11.)  The interviews were conducted by the Principal Joann Bassett and Hord.  (Doc. 17-1 at 223; doc. 17-3 at 15; doc. 17-7 at 72; doc. 22-10 at 11.)  Each applicant was asked the same questions.  (Doc. 17-3 at 14.)  Bassett and Hord scored the applicants separately and compared their scores after the interviews.  (Doc. 17-3 at 14, 25.)

Bassett testified that she made the final decision as to which applicant she recommended for the position.  (Doc. 17-3 at 14-15, 26.)  She testified that she could have selected an applicant with a lower interview score.  (Doc. 17-3 at 25.)  However, she chose the applicant with the highest score, Kathy Huff.  (*Id*. at 27-28 and pl. ex. 13.)  Huff had served as a substitute CNP Manager for several months. (Doc. 17-3 at 29.)  Bassett testified that she recommended Huff because "her responses [in the interview] were very strong and enthusiastic . . . in terms of the job itself."  (*Id*. at 41.)  Hord testified that Huff had "a real good interview."  (Doc. 22-3 at 72.)  He also stated that Huff had a lot of experience before she came to work for defendant.  (*Id*. at 73.)

Bassett did not know plaintiff prior to the interview.  (Doc. 17-3 at 36.)  She was not aware that plaintiff had complaints, including EEOC charges, against defendant. (Doc. 17-3 at 37-39.)  She did not know that plaintiff's son had special needs.  (Doc. 17-3 at 37.)  Bassett testified that neither Costanzo nor Hord spoke badly about plaintiff or told her not to select plaintiff.   (Doc. 17-3 at 40; *see also* doc. 17-7 at 108.)

Plaintiff contends that Hord's scoring steered Bassett away from recommending plaintiff.  (Doc. 22 at 5 [citing doc. 22-10; doc. 17-3 at 27-28].)  However, Bassett testified

33

that she had selected Huff for the position because Huff had the highest interview score,
although she could not remember specifically how the final interview scores were obtained.
(Doc. 17-3 at 28.)  She also testified that she recommended Huff because "her responses [in
the interview] were very strong and enthusiastic . . . in terms of the job itself."  (*Id*. at 41.)
Neither party has presented evidence of the actual interview scores of Bassett and Hord for
the Englewood Elementary position.

Bassett recommended Huff for the CNP Manager position at Englewood Elementary,
and the Board selected Huff for the position.

In February 2009, the EEOC issued a Determination as to plaintiff's second EEOC
charge.  (Doc. 1 at 16-17.)  This letter stated –

> Charging Party alleges that she has a child with a disability.  During the week
> of August 10, 2007, Charging Party submitted an application for the position
> of child nutrition manager at Hill Crest High School.  The position would have
> been a promotion.  On August 17, 2007, Charging Party received a letter form
> the principal, which informed her that she was not selected for the position.
> Charging Party also alleges that she filed a previous charge of discrimination
> . . ., and that the filing of this charge resulted in Respondent's retaliatory denial
> of the promotion.
>
> Respondent denies that it discriminated against the Charging Party.
>
> I have determined that the evidence obtained during the investigation
> establishes that there is reasonable cause to believe that a violation of the
> statute has occurred.  Specifically, the evidence indicates that Charging Party
> was retaliated against because she filed a charge of discrimination.  The
> evidence also indicates that Respondent's decision not to transfer or promote
> Charging Party to a position closer to home, was influenced by Respondent's
> knowledge that she was a caregiver for her disabled child.

(Doc. 1 at 16-17.)

In 2009, plaintiff and others applied for the job of CNP Manager at Maxwell Elementary School.   (Doc. 17-1 at 236; doc. 17-8 at 68.)   Principal Connie Clements recommended that plaintiff be hired for the position.  (Doc. 17-1 at 241, 247; doc. 17-8 at 69.)   Costanzo forwarded Clements's selection to the Board, and the Board approved plaintiff's selection for the CNP Manager at Maxwell Elementary School.   (Doc. 17-1 at 241-42; doc. 17-8 at 69.)

For all of the positions, Costanzo forwarded the principals' selections to the Board and the Board approved each selection.  (Doc. 17-8 at 44.)  Costanzo testified that he was aware plaintiff had complained about not being selected for the positions at issue; however, he "never was told that her complaint was because her child was a special education student." (Doc. 17-8 at 42.)

Following unsuccessful attempts at conciliation, on May 11, 2010, the EEOC issued plaintiff a right-to-sue letter.  (Doc. 17-1 at 236; doc. 1 at 18-19.)   On August 9, 2010, plaintiff filed this action.   (Doc. 1.)   She alleges claims based on each denial of promotion/transfer for the CNP Manager positions set forth above.  She claims defendant did not select her for these positions because of her association with her disabled son and/or in retaliation for engaging in protected activity on behalf of her son or for filing of EEOC charges.

## C. DISCUSSION

Plaintiff alleges that defendant refused to promote and/or transfer her to an available CNP Manager position closer to her home because of her association with her disabled son and/or in retaliation for advocating for her son or complaining about discrimination.

### 1. Disability Discrimination

Plaintiff contends that defendant denied her promotions to a school closer to her home because of her association with her son who has a disability. "The ADA . . . defines the term 'discriminate' to include, among other factors, 'excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.'" *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1230 (11th Cir. 1999)(quoting 42 U.S.C. § 12112(b)(4)).[13]   "The familiar burden-shifting analysis of [*McDonnell Douglas*]

_____

[13]The ADA provides:

(a)  General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b)  Construction

As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes –

. . .

36

is equally applicable to ADA claims."  *Id*. at 1226 (citing *Moses v. American Nonwovens,*

*Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations

and quotations omitted).

---

> (4)  excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association . . . .

42 U.S.C. § 12112(a)-(b).

In this circuit –

A plaintiff attempting to establish a prima facie case of "association discrimination" under the ADA must establish:  (1) that she was subjected to an adverse employment action; (2) that she was qualified for the job at that time; (3) that her employer knew at that time that she had a relative with a disability; and (4) that "the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [the employer's] decision."

*Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001)(quoting *Hilburn*, 181 F.3d at 1230-31).  To satisfy the fourth prong of the prima facie case, plaintiff must show that her son's disability was a determining factor in defendant's decisions not to promote her.  To the extent plaintiff contends she was punished for her efforts of advocating on behalf of her son, "such a claim implicates the prohibition against retaliation contained in . . . the ADA, [and] not the association provision."  *See Oliveras-Sifre v. Puerto Rico Department of Health*, 214 F.3d 23, 26 (1st Cir. 2000).

The Seventh Circuit has divided association claims into "three types of situations" that support an inference that the employee's association with a person with a disability was a determining factor in the employer's adverse employment decision: "[1] 'expense,' [2] 'disability by association,' and [3] 'distraction.'"  *Larimer v. International Business Machines Corp.*, 370 F.3d 698, 700-01 (7th Cir. 2004); *quoted in Trujillo v. PacifiCorp*, 524 F.3d 1149, 1155 (10th Cir. 2008).

[The three situations] can be illustrated as follows:  an employee is fired (or suffers some other adverse personnel action) because (1) ("expense") his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ("disability by association") the

employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours.  The qualification concerning the need for an accommodation (that is, special consideration) is critical because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.  29 C.F.R. § 1630.8; *Den Hartog v. Wasatch Academy*, supra, 129 F.3d [1076,] 1083-85 [(10th Cir. 1997)]; *Tyndall v. National Education Centers, Inc.*, supra, 31 F.3d [209,] 214 [(4th Cir. 1994)].

*Id.*  Plaintiff has not attempted to argue any reason for the alleged animus directed at her because of her son's disability.

Plaintiff has not presented any evidence supporting an inference that any decision-maker viewed her association with her disabled son, as opposed to her advocacy on his behalf, as negatively effecting her job performance.  Indeed, Hord and Costanzo were aware that plaintiff had a disabled son when she was hired and when she was promoted to CNP Manager at Buhl Elementary.  *See Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 488 (6th Cir. 2011)(employer's knowledge of plaintiff's wife's illness for "a long period of time . . . undercuts the inference that [plaintiff's] termination was based on unfounded fears that his wife's disability might cause him to be inattentive at work "); *Erdman v. Nationwide Insurance Co.*, 582 F.3d 500, 511 (3d Cir. 2009)(plaintiff did not present evidence sufficient to support her claim of association discrimination, in part, because her employer had been

39

aware of her child's disability for "many years").  Plaintiff has failed to present substantial

evidence from which a reasonable jury could infer that her son's disability was a determining

factor in her non-selection for the positions at issue.  In her Brief in Opposition to

Defendant's Motion for Summary Judgment, plaintiff argues:

> . . . Defendant argues that [plaintiff] cannot satisfy the fourth element
> of the *Hilburn* test, which requires that the [defendant's] failure to promote
> [plaintiff] occurred under circumstances that would raise a reasonable
> inference that her association with her disabled son was a determining factor
> in the Defendant's decision.  On the contrary, [plaintiff] has more than enough
> evidence to raise a reasonable inference.  First, some of the same people that
> said negative things about [plaintiff], and sometimes in a threatening manner
> – Director Hord and Dr. Costanzo – were the people involved in hiring the
> CNP managers.  Director Hord scored [plaintiff] far lower than Principal
> Hyche did.  In some instances, [plaintiff] was only a few points away from
> being the highest scoring candidate, which was the one who always was
> recommended for the position – notwithstanding their lack of managerial
> experience compared to [plaintiff].  Moreover, when [plaintiff] applied for the
> CNP manager position at Maxwell Elementary, Principal Rickett informed
> [plaintiff] that she would be considered for the position now that her son no
> longer attended the school.  If [plaintiff's] son was not disabled, then she
> would have had a greater likelihood [of] obtaining a promotion.  This evidence
> provides at least a reasonable inference that [plaintiff's] association with her
> disabled son was a determining factor in the Defendant's decision to
> repeatedly fail to promote [plaintiff], to say nothing of Hord's statement that
> what she did held her back, and Costanzo's admission to Tunnell that she cost
> the system a lot of money with her advocacy.

(Doc. 22 at 25-26.)  The court has considered the evidence plaintiff contends supports her

prima facie case of association discrimination and, for the reasons set forth below, the court

finds plaintiff's evidence is insufficient to support a reasonable inference that defendant did

not select her for the CNP Manager positions at issue because of her son's disability.

### a. Costanzo's Statements Regarding Plaintiff are Irrelevant

Plaintiff alleges that Costanzo told plaintiff's representative, after a hearing on her grievance, "Do you know how much money [Plaintiff] had cost the system?' This statement was not made with regard to plaintiff's son or his disability.  Moreover, the undisputed evidence proves that Costanzo did not have any part in the selection decisions and that he recommended the principals' selections to the Board each and every time – including plaintiff's selection for the Maxwell Elementary position in 2009.  Although plaintiff argues that Costanzo "could have" influenced the principals during the selection process, she has not presented any evidence sufficient to support an inference that he actually "did" influence the principals or otherwise caused plaintiff's non-selection for any of the positions at issue.  Her argument that Costanzo influenced the selection decisions at issue is "pure speculation." *See Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999)("The evidence that Miller and Hollingsworth spoke in the time period between Clover's participation in the investigation and Miller's decision to terminate her shows, at most, that Hollingsworth could conceivably have told Miller about Clover's participation.  But because 'could have told' is not the same as 'did tell,' it would be pure speculation to infer that Hollingsworth actually told Miller about Clover's participation.  . . .  A jury finding that Miller was aware of Clover's protected conduct must be supported by reasonable inferences from the evidence, not mere speculation.").

Hord and every principal involved in the six selection decisions at issue testified that Costanzo did nothing to influence their recommendation of the CNP Manager.  Plaintiff has offered no evidence to impeach their unequivocal denials.   Therefore, the court finds Costanzo's statements are irrelevant.  *See id*. at 1355-56.

### b.  Hord's Statements

Plaintiff argues that Hord made statements to and about plaintiff that show he was motivated by a discriminatory animus based on plaintiff's association with her son.  However, none of these statements are unambiguously about plaintiff's son and his disability or otherwise indicate discriminatory animus toward people with disabilities or people associated with disabilities.  Given the clear and unrebutted testimony of the principals that Hord did not influence their decisions, his less than supportive statements to and about plaintiff do not support a reasonable inference that she was not selected for the positions at issue because Hord was motivated by unlawful discrimination.

### c.  Hord's Scores

Plaintiff contends that evidence of Hord's score of plaintiff's interview for the Hillcrest High School position, which was much lower than Hyche's score, supports an inference that plaintiff was not selected for any of the positions at issue because of her association with her son.

First, the record contains only Hyche and Hord's scores from the Hillcrest High School interviews and only the scores for Hupp and plaintiff.  Nothing in the record indicates

the score assigned by the other principals and Hord at the other schools.  Without such evidence, plaintiff's assertion that she did not have the highest interview score at the other school because of Hord is only unwarranted conjecture.

Second, the evidence of the scores of Hyche and Hord for the Hillcrest High School position do not show that plaintiff would have been the highest scoring applicant but for Hord's low score.  Hyche gave Hupp a score of 53 and plaintiff a score of 51.  (*See* doc. 22-19 at 2, 4.)  Hord gave plaintiff a score of 29 and Hupp a score of 54.  (*Id*. at 3,5.)  Plaintiff has not attempted to dispute Hord's scores, except to state that she had more experience than Hupp.  Hyche gave Hupp, the successful applicant, a higher score than he gave plaintiff.  Also, Hyche testified that he considered the scores of the assistant principals in determining the final interview score.  Without the score sheets of the assistant principals and given the fact that Hyche scored Hupp higher than plaintiff, the evidence is insufficient to demonstrate that Hord's low score for plaintiff caused her non-selection for the Hillcrest High School CNP Manager position.  Therefore, this evidence does not support any inference that plaintiff was not selected for the Hillcrest High School position because of her association with her disabled son.

### d.  Rickett's Comment

Plaintiff contends that Rickett's comment, that plaintiff could be considered for a position at Maxwell Elementary because her son was no longer a student at the school, (*see* doc. 17-1 at 129-31), supports an inference that "she would have had a greater likelihood of

obtaining a promotion" if she did not have a disabled son.  (Doc. 22 at 25.)  The court disagrees.  The statement does not mention her son's disability.  Also, although plaintiff's son was not a student at Maxwell Elementary when Rickett made the statement, he was, and is, a student with a disability in the defendant's school system.  Drawing an inference that defendant harbored animus toward plaintiff because of her son's disability based on a statement that plaintiff would be considered for a position at a school where her son was not a student is simply not reasonable.

Based on the foregoing, the court finds that plaintiff has not established sufficient evidence to allow a reasonable jury to find that she was denied the promotions at issue because of her association with her disabled son.  Therefore, defendant's Motion for Summary Judgment will be granted and plaintiff's association claims will be dismissed.

### 2.  Retaliation

Pursuant to the ADA, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  "This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation.  Accordingly, [the court] assess[es] ADA retaliation claims under the same

framework [it] employ[s] for retaliation claims arising under Title VII." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)(citation omitted).

### a. Prima Facie Case

"In order to prove an ADA retaliation claim, a plaintiff must show that:  (1) [she] engaged in conduct protected by the ADA; (2) [she] was subjected to an adverse employment action at the time, or after the protected conduct took place; and (3) the defendant took an adverse employment action against [her] because of [her] protected conduct."  *Collado v. United Parcel Service*, 419 F.3d 1143, 1158 (11th Cir. 2005)(internal quotations and citation omitted).

### i. Protected Activity

Defendant "acknowledges that Ms. Rhodes advocated for her son and that she filed two EEOC charges and three employment grievances."  (Doc. 16 at 26.)  Between 2003 and August 2008, plaintiff did not file due process claims and state complaints regarding her son. However, she also contends that she advocated for her son in-house during this time period with his teachers and principals at Hillcrest Middle School.  Also, plaintiff filed grievances in 2001, 2007, and 2008.  The 2001 grievance, which complained of Smith contacting Hord, is too far removed from the decisions at issue to establish a causal connection between this grievance and the selection decisions in 2007 and 2008.  *See Clark County School Dist. v. Breeden*  532 U.S. 268, 273-274 (2001)("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action

as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.  Action taken . . . 20 months later suggests, by itself, no causality at all.")(internal citations and quotations omitted).  Also, nothing in the record indicates that the 2007 and 2008 grievances contained any complaint about disability discrimination or retaliation.  Therefore, the court does not consider the 2007 and 2008 grievances to be protected activity.  *See Brown v. City of Opelika*, 211 Fed. Appx. 862, 864 (11th Cir. 2006)(finding plaintiff did not engage in protected activity because she did not use the word "race" or recount "racially derogatory comments"); *see also Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003)("Although an employee need not use the magic words . . . to bring her speech within Title VII's retaliation protections, "she has to at least say something to indicate her [protected characteristic or retaliation] is an issue.  An employee can honestly believe she is the object of discrimination [or retaliation], but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.")

Plaintiff filed two EEOC charges – the first on April 6, 2007, and the second on September 5, 2007.  The court finds plaintiff's advocacy on behalf of her son and her EEOC charges are protected activity.

### ii.  Adverse Action

The denial of the promotions/transfers at issue constitute conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

46

*See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Thus, the court finds the selection decisions challenged by plaintiff are adverse employment actions.

### iii.  Causal Connection

"The causal link element [of the retaliation prima facie case] is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)))(internal quotations omitted).  "A plaintiff satisfies this element by showing that the decision-maker knew of the protected activity, and that a close temporal proximity existed between this awareness and the adverse employment action." *Castillo v. Roche Laboratories*, 2012 WL 1648873 at *2 (11th Cir. 2012)(citing *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)).

Plaintiff argues that Costanzo and the Board, the defendant, were aware of her protected activity; therefore, she does not have to prove that the principals and Hord, the decision-makers, were aware of her protected activity.  Plaintiff is mistaken.  Binding Eleventh Circuit precedent requires that the employer's agent or employee responsible for taking the adverse action or making the adverse decision  – the decision-maker – was aware of the protected activity. *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997)("Since corporate defendants act only through authorized agents, in a case

involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action.")(citation omitted).  Costanzo and the Board members were not involved in the selection decision at issues; therefore, their knowledge of plaintiff's protected activity is irrelevant.

Hord testified that he was not aware of plaintiff's advocacy on behalf of her son after plaintiff became the CNP Manager at Buhl.  Of the principals, only Dockery was aware of plaintiff's advocacy for her son; she had participated in IEP meetings.  But she testified that the meetings were without friction and that she was unaware plaintiff had "filed certain legal documents against the School Board."  (Doc. 17-2 at 51-52.)  The court finds, except for Duncanville Middle School, plaintiff has not shown that the decision-makers were aware of plaintiff's protected activity on behalf of her son.

The undisputed evidence shows that none of the decision-makers involved in the selection decisions at issue – Hord and the principals – knew that plaintiff had filed EEOC charges at the time they made their decisions.  Although Costanzo knew about the EEOC charges, nothing in the record indicates that he told Hord and/or any of the principals that plaintiff had filed EEOC charges.  The Eleventh Circuit has "made clear . . . that in the context of Title VII retaliation claims neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge."  *Summers v. City of Dothan*, 444 Fed. Appx. 346, 352 (11th Cir. 2011)(quoting *Brochu v. City of Riviera Beach*, 304 F.3d

48

1144, 1156 (11th Cir. 2002))(internal quotations omitted).  The court finds this principle applies equally to ADA retaliation claims.

The court finds no causal connection between plaintiff's non-selection for the positions at issue and her filing of EEOC charges.

Based on the foregoing, the court finds that plaintiff has failed to establish a prima facie case of retaliation with regard to the selection decision at issue, except for the Duncanville Middle School position.  Therefore, defendant's Motion for Summary Judgment is due to be granted and plaintiff's retaliation claims, except the Duncanville Middle School decision, will be dismissed.

### b.  Pretext

"After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability."  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008)(citing *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995)).  "[I]f the employer articulates one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination."  *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004))(internal quotations omitted).

Even if the court assumed a prima facie case of retaliation,[14] the court finds plaintiff has not offered sufficient evidence from which a reasonable jury could find that defendant's articulated reasons for its selection decisions is unworthy of credence and retaliation for plaintiff's advocacy for her disabled son and/or for filing EEOC charges was the true reason she was not selected for the positions at issue.

> To show pretext, [plaintiff] had to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). He could not "recast [defendant's] proffered nondiscriminatory reasons or substitute his business judgment for that of [defendant]. Provided that the proffered reason [was] one that might motivate a reasonable employer, [plaintiff] [had to] meet that reason head on and rebut it . . . ." *Chapman* [*v. AI Transport*], 229 F.3d [1012,] 1030 [(11th Cir. 2000)]. Thus, to avoid summary judgment, [plaintiff] had to produce sufficient evidence to rebut each of [defendant's] proffered legitimate, nondiscriminatory reasons. *See id*. at 1037.
>
> Furthermore, federal courts do not sit "as a super-personnel department that reexamines an entity's business decisions . . . ." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Disparities in qualifications "must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate over the plaintiff for the job in question." *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004), overruled in part on other grounds, *Ash v. Tyson Foods*, 546 U.S. 454, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006).
>
> The district court did not err in concluding [plaintiff] failed to establish [defendant's] reason for promoting the other candidate was pretext for race or age discrimination. Although [defendant's] reason for promoting the other candidate – his superior interview performance – was subjective, "subjective

---

[14]As noted above, the court assumes a prima facie case as to the position at Duncanville Middle School.

50

reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions." *Chapman*, 229 F.3d at 1034. Furthermore, [plaintiff] failed to identify a disparity in qualifications such that no reasonable person, in the exercise of impartial judgment, would have promoted the other candidate over him. *See Cooper*, 390 F.3d at 732. Although [plaintiff] had more seniority and experience, he failed to rebut or even address the other candidate's identified strengths in the other dimensions on which [defendant] relied. Accordingly, the district court did not err in granting summary judgment for [defendant's] on [plaintiff's] 's race and age discrimination claims.

*Porter v. American Cast Iron Pipe Co.*, 427 Fed. Appx. 734, 736-37 (11th Cir. 2011).

Defendant contends that the principals selected the individuals they felt were the most qualified and the best fit for their schools. Plaintiff contends:

The Defendant claims that it hired the other candidates because they were the most qualified. This reason is pretext because the candidates hired were not the most qualified. Every candidate hired over Rhodes was a CNP **worker**, with little or no experience as a CNP **manager**. Rhodes, on the other hand, had several years of experience as a CNP manager. Moreover, Principal Dockery and Principal Monroe's reasons for choosing Boatner and Robinson, respectively, over Rhodes are particularly troubling. Principal Dockery claims that they recommended Boatner because she was qualified, energetic, and lived near the school. Principal Dockery also admitted that Rhodes was qualified and energetic, and one of the main reasons that Rhodes wanted to be transferred to one of the schools she applied to is so that she could be closer to home. Furthermore, Principal Monroe claimed that they recommended Robinson because she was highly recommended by her previous principal and CNP manager. Rhodes was also highly recommended by her principal, co-workers, and even Director Hord.

(Doc. 22 at 30 [emphasis in original].) Plaintiff also contends that Hord's scores kept her from being the candidate with the highest interview scores.

Plaintiff contends that she was the most qualified candidate because she had the most experience as a CNP Manager. "[When] a plaintiff attempts to show pretext by arguing that

[she] was more qualified than another individual, [she] must show, in light of those superior qualifications, that 'no reasonable person' would have selected the other candidate rather than the plaintiff." *Lucas v. United States Attorney General*, 467 Fed. Appx. 854, 858 (11th Cir. 2012)(citing *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)).  Experience is not necessarily the most important factor in determining the best qualified candidate for the CNP positions at issue.  *Springer*, 509 F.3d at 1349 ("Personal qualities ... factor heavily into employment decisions concerning supervisory or professional positions.  Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position.")(quoting *Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir.2001)).

All the decision-makers agree that the application with the highest interview score was selected.  Plaintiff has not referred to any evidence that her experience correlated to her ability to interview well or that her performance during the interview was better than the allegedly less-experienced applicant selected.  Also, she has not presented any evidence to indicate that the successful applicants did not interview as well or less well than she did.  In other words, plaintiff's experience as a CNP Director does not support an inference that defendant's articulated reasons for selecting another candidate with a higher interview score, is a pretext and retaliation was the real reason plaintiff was not selected.

The principals and Hord testified that the principals selected the candidates for the CNP Manager positions based on their interview scores – the candidates with the highest interview scores were selected.  Plaintiff contends that Hord scored her so low that she was prevented from being the highest scoring applicant.  Although plaintiff has submitted the scores of Hyche and Hord for her interview and that of Hupp, the scores do not support her position that Hord's low score prevented her from being the highest scoring applicant.  The evidence shows that Hyche gave plaintiff a lower score than the score he gave Hupp.  Hord's low score may have made the difference between Hupp and plaintiff wider, but it was not the sole reason that plaintiff was not the highest scoring applicant for the Hillcrest High School position.

Also, the court has no score sheets from the interviews at the other schools.  The court will not presume that Hord's scores for plaintiff's interviews prevented her from being the highest scoring applicant based solely on the Hillcrest High School scores from Hyche and Hord for plaintiff and Hupp.

Principals Hyche, Hobbs, and Scott testified that they selected applicants that had worked at their respective schools.  Plaintiff has not presented evidence to rebut their testimony that their familiarity with the candidates influenced their decisions.  The court finds plaintiff has not attempted to rebut this articulated reason with regard to the selection decisions for Hillcrest High School, Hillcrest Middle School, and Mathews Elementary School.

Plaintiff challenges Dockery's articulated reasons for selecting Boatner for the position at Duncanville Middle School.  Particularly, plaintiff contends Dockery selected Boatner "because she was qualified, energetic, and lived near the school," and that Dockery had also testified that plaintiff was "qualified and energetic" and plaintiff wanted to work closer to home.  (Doc. 22 at 30.)  Dockery testified that she did not know where plaintiff lived.  (Doc. 17-2 at 74.)  Also, she testified that promoting Boatner would not "cause a domino effect in any school," as would selecting a CNP Manager, like plaintiff, for the CNP Manager position at Duncanville Middle School.  (*Id*. at 71.)  She testified that other selections she made that summer "were pretty much all filled from people that were not coming from another school . . . .  So that was just bringing the newness of the school together and bringing in new people and opportunities." (*Id*. at 71-72.)  Plaintiff's evidence – that she had good energy and wanted to transfer to be closer to home – does not address Dockery's stated preference for new people and rebut head-on the reasons Dockery gave for selecting Boatner.

Plaintiff also challenges Monroe's articulated reason for selecting Robinson for the position at Faucett-Vestavia Elementary School.  Monroe testified that she "ultimately decide[d] that Pam Robinson was a better candidate for the manager position than [plaintiff]," because Robinson "came highly recommended." (Doc. 17-6 at 37.)  She testified that Robinson's Principal and CNP Manager recommended her.  Plaintiff contends that she "was also highly recommended by her principal, co-workers, and even Director Hord." (Doc.

22 at 30.)  However, Monroe did not call plaintiff's references, (doc. 17-6 at 37), and the record does not support an inference that plaintiff included her recommendations with her application.  Plaintiff's contention – her references would have recommended her if Monroe had asked them – does not support an inference that Monroe's articulated reason for hiring Robinson – her Principal and CNP Manager contacted Monroe and "highly recommended" Robinson – is a pretext for retaliation.

Based on the foregoing, the court finds that plaintiff has not established that defendant's articulated reasons for not selecting plaintiff for the CNP positions at issue are unworthy of credence and/or that the real reason plaintiff was not selected was retaliation for advocating for her son or filing EEOC charges.  Therefore, defendant's Motion for Summary Judgment as to plaintiff's retaliation claims will be granted and her claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 17), and granting in part and denying in part plaintiff's Motion to Strike, (doc. 25), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 24th day of March, 2013.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE